BLAIR HOLDING CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Blair Holding Co. v. Commissioner
Docket No. 11203-76.
United States Tax Court
T.C. Memo 1980-79; 1980 Tax Ct. Memo LEXIS 506; 39 T.C.M. (CCH) 1255; T.C.M. (RIA) 80079; March 19, 1980, Filed *506 Held: Interest payments received by petitioner from a related corporation under a claim of right were includable in its gross income thereby subjecting petitioner to the personal holding company tax; petitioner was not a mere conduit or nominee. Bell Realty Trust v. Commissioner,65 T.C. 766 (1976) followed. Joseph Schoenholz, for the petitioner. Steven I. Klein, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: *508 Taxable year
Deficiency
April 1, 1971 - March 31, 1972
$10,207.07
April 1, 1972 - March 31, 1973
$ 7,849.46
The sole issue for decision is whether interest on loans from petitioner to a related corporation was includable in petitioner's gross income, thereby subjecting it to the personal holding company tax imposed by section 541. [1]
FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Blair Holding Co., Inc. (hereinafter petitioner), a corporation organized under the laws of the state of New Jersey, maintained its principal place of business in Carteret, New Jersey, when it filed its petition in this case. Petitioner filed Federal corporate income tax returns for its fiscal years ending March 31, 1972 and March 31, 1973, with the Internal Revenue Service, Newark, New Jersey. For the years involved herein, petitioner was a member of a brother-sister controlled group within the meaning of section 1563(b)(2). The other members were Republic Wire Corporation (hereinafter Republic), Republic Distributors, Inc., and Rep-Loy Steel, Inc. *509 During the fiscal year ending March 31, 1972, the oustanding stock of petitioner, consisting solely of voting common stock, was owned as follows: Shareholder
Number of Shares
Norman Geller
75
Trust for Norman Geller's two children
25
Bernard Mondi
50
During the following fiscal year, Bernard Mondi's stock in petitioner was redeemed. Consequently, by the end of fiscal 1973, all of petitioner's outstanding stock was owned by Norman Geller and the trust established for his two children. The shareholdings in Republic for these two years were exactly the same as in petitioner, except that Republic also had outstanding non-voting preferred stock, all of which was owned by Norman Geller's sister. Petitioner was in the business of renting real property. In May 1957, petitioner purchased property located at 500 Blair Road, Carteret, New Jersey (hereinafter Blair Road property) and executed a first mortgage to the seller, Lumber Industries. Petitioner leased a portion of this property to its sister corporation, Republic, which manufactured drawn wire. On January 6, 1971, petitioner executed a 10-year lease agreement with Republic. This agreement leased a *510 portion of the Blair Road property to Republic for monthly rent of $4,167.67. On the same date, the petitioner also executed a 10-year lease agreement for another portion of that property with Townsend Trucking Corporation for monthly rent of $1,500. In late January 1971, Republic borrowed $500,000 from Community State Bank & Trust Company (hereinafter Community) to finance its operations. This loan was secured by a lien on all the equipment and inventory of Republic, a guarantee that the accounts receivable of Republic would not be pledged during the term of the loan agreement and the personal guarantees of Norman Geller, Bernard Mondi and their respective wives. As further security for this loan, Community also received a second mortgage on the premises at 500 Blair Road from petitioner and an assignment of the lease between petitioner and Republic.Community agreed to subordinate its second mortgage to any first mortgage put upon the subject property by petitioner.
In May of 1971, Republic was still in need of additional financing. This time, however, it was arranged that petitioner borrow the money using its real property as security. Pursuant to this arrangement, petitioner, *511 on May 27, 1971, borrowed $500,000 from the First Federal Savings and Loan Association (hereinafter First Federal). The money was borrowed at 8 3/4 percent interest and was repayable over 15 years at the rate of $4,997.30 per month. In addition, petitioner was also required to pay monthly in escrow a sum equal to one-twelfth of the estimated annual taxes on the premises at 500 Blair Road. At the time petitioner was negotiating for this loan, approximately $15,000 was still owing on the first mortgage from petitioner to Lumber Industries. Prior to receiving the loan, petitioner paid off the balance of the first mortgage to Lumber Industries. A portion of the funds used to pay off that mortgage was received from Republic. On its books, petitioner treated the funds received as a credit to its intercompany loan account -- due from Republic. The loan from First Federal was secured by a first mortgage on the property at 500 Blair Road. As further security, petitioner assigned to First Federal the rents due under its lease agreements with Republic and Townsend Trucking Corporation. Bernard Mondi and Norman Geller also guaranteed the performance by those tenants of their lease *512 obligations. During their preliminary review of petitioner's loan application, First Federal was provided with consolidated financial statements of both petitioner and Republic. It was the regular practice of the bank to consider the financial position of the tenant when loaning on the security of rental real property. Republic, however, did not endorse petitioner's mortgage note nor did it guarantee the repayment of petitioner's indebtedness to First Federal. On May 27, 1971, petitioner received the net proceeds of its loan from First Federal, which amounted to $494,492.33. The bank charged petitioner's account for the $5,507.67 of expenses connected with securing the loan. On its books, petitioner carried this loan as a $500,000 mortgage payable. Petitioner deposited the net proceeds into its checking account at the First National Bank of Somerset County, New Jersey (hereinafter First National).
Petitioner subsequently transferred $494,000 to Republic by drawing a series of checks on its account at First National. This transaction was carried on the books of petitioner as a debit to its intercompany loan account -- due from Republic, in the amount of $494,000. The transaction *513 was carried on the books of Republic by crediting its intercompany loan account -- due to Blair Holding Co., in the amount of $494,000. During the years in issue, petitioner paid First Federal the monthly installments, due under its mortgage obligation. Each payment consisted partly of interest, principal and estimated annual property taxes. Republic followed no fixed schedule for repaying the sums borrowed from petitioner. Thus, petitioner received payments, exclusive of rent, in varying amounts from Republic. The amounts received by petitioner did not correspond to the monthly payments of principal and interest which petitioner was obligated to make to First Federal. On its books, petitioner treated these loan repayments as a credit to its intercompany loan account -- due from Republic. Conversely, Republic accounted for these payments by debiting its intercompany loan account -- due to Blair. Petitioner also credited its intercompany loan account with payments or intercompany charges by Republic which were for the benefit of or were allocable to petitioner.For the fiscal year ending March 31, 1972, these intercompany payments and charges which were for the benefit *514 of or which were allocable to petitioner amounted to $11,527.50 and $25,693.00. For the fiscal year ending March 31, 1973, said intercompany charges and payments amounted to $11,527.50 and $11,011.28. These payments and charges were reflected on Republic's books as a debit to its intercompany loan account. For its fiscal year ending March 31, 1973, petitioner, per its books, treated the $32,794.20 of interest on the loans to Republic as a debit to its intercompany loan account -- due from Republic. Petitioner also credited its interest expense account in the amount of $32,794.20. The $32,794.20 was equal to the amount of interest expense which petitioner accrued on its loan from First Federal. Republic treated the interest expense on the loan by debiting interest expense in the amount of $32,794.20 and crediting its intercompany loan account -- due to Blair, $32,794.20. For its fiscal year ending March 31, 1973, petitioner treated the interest of $41,811.29 on the loans to Republic similarly to that of the prior year, except that instead of crediting interest expense, the credit was to an interest income account. The $41,811.29 was equal to the amount of accured interest *515 due on its loans from First Federal during this same period.
On its Federal income tax returns for the fiscal years ending March 31, 1972 and March 31, 1973, petitioner included the interest from Republic in its gross income [2] and took corresponding deductions. In his notice of deficiency, respondent determined that over sixty percent of petitioner's adjusted ordinary gross income for these years was personal holding company income. Accordingly, respondent determined that petitioner was a personal holding company subject to the 70 percent penalty tax imposed by section 541. OPINION We must determine whether, for its fiscal years ending March 31, 1972 and March 31, 1973, petitioner was a personal holding company subject to the 70 percent penalty tax imposed by section 541. A personal holding company is defined under section 542(a) as a corporation satisfying the following two requirements: 1. Adjusted ordinary gross income requirement. -- At least 60 percent of its adjusted ordinary gross income (as defined in section *516 543(b) (2)) for the taxable year is personal holding company income (as defined in section 543(a)); and 2. Stock ownership requirement. -- At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals * * *. Since the parties agree that the stock ownership test of section 542(a) (2) has been satisfied, at issue is whether the income requirement of section 542(a) (1) has been met. Resolution of this issue depends upon whether the interest paid to petitioner by Republic is includable in petitioner's gross income for the years before us. [3]
Petitioner, relying on prior decisions from this Court, [4] contends that it was merely a conduit through which the borrowed funds from First Federal were channeled to Republic. On this theory, petitioner argues that, since it received the interest payments from Republic solely for transmission to First Federal without any claim *517 of right, those payments did not constitute gross income. Respondent, on the other hand, argues that the facts herein are indistinguishable from those of , affd. without published opinion, , and, therefore, the interest payments were includable in petitioner's gross income. We agree. In , the taxpayer, a Massachusetts business trust, obtained loans from a bank to provide financing for two related corporations. The loans were not guaranteed by the other corporations, but were secured solely by a mortgage on taxpayer's real estate. Although the taxpayer received no notes or other security for distributing the borrowed funds to the related corporations, such distributions were treated as loans receivable on its books and as loans payable on the books of the two corporations. On these *518 facts, this Court held that Bell Realty Trust was not a conduit because its legal obligation to the bank was separate and distinct from the respective obligations of the related corporation to that taxpayer. Since the interest payments were received by the taxpayer under a claim of right, they were included in its gross income. Petitioner maintains that unlike , the mortgage loan herein was, in substance, made to the related corporation Republic. In support of this contention, petitioner relies on certain Board of Director resolutions which it claims, conclusively demonstrated that Republic was obligated to pay off that loan and bear the expenses connected therewith. We find this contention to be without merit. Although First Federal was undoubtedly aware that Republic would receive the loan proceeds, the fact remains that this loan was actually made to petitioner. We are not persuaded by the Board resolutions cited by petitioner. The record reveals that these purported documents were put in writing six years after the loan transaction was consummated and do not reflect the true nature of that transaction. Thus, *519 contrary to the statements contained therein, Republic was not obligated to pay off the mortgage or bear any of the expenses incident to obtaining that loan. In this connection, we note that not only do the books of Republic fail to indicate any obligation to pay the loan expenses, but also the record clearly shows that First Federal, in fact, charged petitioner's account for the full amount of those expenses. Moreover, the mortgage note was executed solely on behalf of petitioner and was not endorsed by Republic. The loan itself was secured only by petitioner's assets and was in no way guaranteed by Republic. Although petitioner points to a loan application purporting to evidence a guarantee by Republic, that document was both factually inaccurate and incomplete. Consequently, it does not merit further consideration. In addition, while we recognize that Norman Geller and Bernard Mondi guaranteed the rents due petitioner under two lease agreements, they did not personally guarantee the repayment of petitioner's indebtedness to First Federal. In any event, reliance upon those shareholder guarantees would be misplaced because they are not the guarantees of Republic. Furthermore, *520 despite these guarantees, petitioner was still primarily liable for repayment of principal and interest on the mortgage. The testimony of Michael Barrett, mortgage officer at First Federal, clearly reveals that the bank regarded petitioner as the primary obligor on the note and that its real estate was the principal security for the loan. Compare . The financial condition of Republic was considered only insofar as it affected petitioner's ability to satisfy its obligation to the bank. In the event petitioner defaulted on its obligation, First Federal would certainly look to petitioner's assets to recoup the outstanding loan balance. In view of these facts, we are convinced that petitioner was the actual debtor with respect to the mortgage loan from First Federal rather than a mere nominee or conduit. Petitioner's obligation to First Federal was clearly separate and distinct from Republic's obligation to petitioner. If petitioner had defaulted, Republic would still have been obligated to petitioner for the entire indebtedness. Moreover, Republic's delinquency or default would not have affected petitioner's *521 primary liability for the $500,000 owed to the bank. Additional evidence demonstrating the independent nature of these obligations is provided by the fact that Republic's loan repayments did not track the monthly payments that petitioner was required to make to First Federal. As in Bell Realty Trust, petitioner received the interest from Republic under a claim of right without any obligation to transmit "that interest" to the bank. Accordingly, the interest received was includable in gross income regardless of petitioner's obligation to pay an identical interest charge to its creditors. Petitioner advances several additional arguments in its attempts to distinguish Bell Realty Trust from the instant case.We have carefully considered each of those contentions and find them unpersuasive. Finally, petitioner contends that it should not be subject to the personal holding company tax because there was no tax avoidance motive in the loan transactions involved herein. While this may be a persuasive argument in other areas of the tax law, it is well settled that the personal holding company provisions provide for a mechanical test in which the absence of such motive is irrelevant. *522 ; . Accordingly, we must sustain respondent's application of the personal holding company tax to petitioner. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioner's gross income for the tax years at issue was $100,794.24 and $109,811.33, respectively, consisting entirely of interest and rental income.↩
3. The effect of including this interest would be to classify petitioner's adjusted income from rents as personal holding company income, thus satisfying the income test under section 542(a) (1).↩
4. ; ; .↩